(47 App. Div. 503.)

### REMSEN v. BRYANT et al.

(Supreme Court, Appellate Division, Second Department. February 2, 1900.)

1. LIBEL—GENERAL REPUTATION OF PLAINTIFF.

> In an action against a newspaper for libel in publishing an article stating that plaintiff had "made his name notorious and hated," defendant can show plaintiff's general reputation in the community in which he lived.

2. SAME—SPECIFIC ACTS—EVIDENCE.

> In an action for libel, in which the plaintiff's reputation was in issue, where a witness had testified that the general talk was that plaintiff was a crank and a hypocrite, it was error for the court on cross-examination to ask the witness if he knew of any act of plaintiff which would justify calling him a crank and a hypocrite, since the general reputation of plaintiff did not depend upon witness' knowledge of specific acts by him.

3. SAME—TRUTH OF PUBLICATION—INSTRUCTION.

> In an action against a newspaper for libel, where the defense was that the matter published was substantially true, and there was evidence which would have justified the jury in reaching the conclusion that the matter published was so substantially true as to mitigate the damages, it was error to charge, over defendant's objection, "that there was no pretense that the matter was true," and "no evidence which warrants you in even discussing the question whether the libel is substantially true."

Appeal from trial term, Queens county.

Action by Isaac B. Remsen against William C. Bryant and others. From a judgment for plaintiff, and from an order denying a new trial on the minutes, defendants appeal. Reversed.

Argued before GOODRICH, P. J., and BARTLETT, HATCH, WOODWARD, and HIRSCHBERG, JJ.

James W. Covert, for appellants.
A. P. Van Thun, Jr., for respondent.

WOODWARD, J. An examination of the record convinces us that the judgment and order appealed from should be reversed, and that a new trial should be granted. The action is for libel. The defendants are the publishers of the Brooklyn Daily Times, and on the 13th day of November, 1897, they published in their newspaper an article in which it was stated that:

"When I. B. Remsen, of Jamaica, the widely known revivalist and evangelist, left here [the village of St. James] at the close of last week, he announced that he would return the following Thursday. Many people doubted that he would ever return. He has not, and thereby hangs a tale. Mr. Remsen is not overpopular in this neighborhood, but he is a brave man, and it takes much to discourage him. His method of inculcating Christian principles is not appreciated in this community. People do not like being told that, unless they immediately become converted to his ideas, they will surely be damned. They are, moreover, not too fond of rant and cant. Mr. Remsen has a powerful voice and a vehement vocabulary. The first two nights that he preached here at Liberty Hall he had a large audience, who wanted to have a look at the man who had made his name notorious and hated in August three years ago at the neighboring village, Stony Brook. His utterances were so fierce, however, that the people became disgusted,'and there were angry remarks made by many. Women kept away from the hall. As the crowds lessened, Remsen's language and actions became more and more reprehensible, until at last some young men of the village determined to show him that his absence was preferred to his presence. At the close of the week he left the hall, apparently full of anger. As he started to go for his buggy and sorrel horse, a crowd of young men suddenly surrounded him. Yells, hisses, groans broke the nightly silence. Mr. Remsen stood still, and wondered what was coming. Bang! bang! went the crack of many a rifle. This was threatening, yet the revivalist seemed undaunted. Whirr! Through the air sped some rotten lemons. The evangelist shouted something that could not be heard in the general uproar. Eggs, fresh and stale, began to fly. Several struck the lay preacher. 'Throw away!' he cried, undismayed, 'throw all the eggs you want. You can't hurt me!' he yelled. But he made haste to get into his buggy. He drove away, followed by threats and yells that might have made most men faint, and this is probably the reason why he did not return last Thursday. Before Mr. Remsen closed his meetings, he is said to have stated that he intended holding services in Stony Brook."

Following this was a dispatch from Stony Brook, in which it was said that:

"The rumor that Evangelist I. B. Remsen would preach here again is not believed by any one. Public sentiment is too strongly opposed to him here. It was aroused to such a pitch at the time against him that he was warned just in time to make his escape to avoid serious mishandling. He was informed, so it is claimed, that if ever he stopped in this village again it would be at his own risk. He took heed of the warning, and his countenance was not seen here for a long time afterwards. Lately, however, he has been seen to pass through Stony Brook, but he has not yet dared to remain overnight, as far as the public knows."

Subsequently one D. V. Teed, styling himself "Pastor of the Church at St. James and Lake Grove," wrote a letter to the Times, in which he declared the article above quoted "false in every particular," and made use, among other things, of the following language:

"This mountebank or charlatan who hails from Stony Brook had better secure some of the eggs which he says were thrown at the revivalist, or some others, and set on them. Perchance he might hatch out something having some

resemblance to himself, but he would in all probability fail to hatch out any bigger liar than himself."

In response to this chaste "imagery of a melancholic fancy," the Times remarked that:

"It is only fair to the Brooklyn Times, and to the thousands of Long Island people who place confidence in the reliability of its news service, to state that there are in the Brooklyn Times office written statements from residents of St. James confirming in all important details the story of the egg-throwing as published in the Times on November 13th. These written statements declare that eggs and a rotten lemon were thrown at Evangelist Remsen after he left Liberty Hall, and one statement declares that the writer saw the eggs and rotten lemon strike the person of Mr. Remsen. The Times is in possession of the names of the persons who threw the missiles. Such being the case, it will hardly be possible for the reporter of the paper who wrote the original story to adopt the novel suggestion made by Pastor Teed," etc.

This is the foundation of the libel charged, and while it is true, as remarked by this court upon a former appeal (36 App. Div. 240, 56 N. Y. Supp. 728), that "some parts of these articles are not libelous in any sense," we are of opinion that, taken as a whole, these articles do hold the plaintiff up to ridicule and contempt in the community, and that they are libelous. As was said on the former appeal: "There was also evidence to the effect that his general reputation was bad. Considering this evidence and the general character of the libel, we think that the court would not have been justified in interfering with the verdict of the jury [for six cents] unless error had been committed upon the trial;" and we are persuaded that the judgment in this case is all out of proportion to the demands of justice or considerations of public policy. We are not disposed, however, to argue this point, preferring to determine this appeal upon the questions arising upon the trial of the action. The defendants were charged with libel, in that they had published, among other things, that the plaintiff had "made his name notorious and hated," and this is, perhaps, the most serious part of the libel. Herbert B. Wells was called as a witness for the defendants, and counsel asked on direct examination, after showing the residence of the witness to be in Jamaica: "Mr. Wells, do you know the general character and reputation of Isaac B. Remsen in Jamaica?" To this Mr. Wells replied: "I have heard him spoken of." At this point the court interrupted, and asked: "Do you know his general reputation?" Counsel for the defendants said: "Taking the speech of people." The court then asked: " 'The speech of people' means his general reputation. You know what it is to say that a man's reputation in a community is good or bad, do you not,— whether he is a good citizen or a bad citizen? Witness: From the speech of people, I know; yes, sir. Court: You know what it means to say a man's reputation in the community in which he lives is bad? Witness: Yes. Court: That is a sweeping assertion. Witness: Yes, sir. Court: Now, you know what it is to say he bears a good reputation in the community in which he lives? Witness: Yes, sir. Court: Now, do you know Remsen's reputation,—whether it is good or bad in the neighborhood in which he lives? Witness: Personally I do not." At this point counsel for defendants attempted to resume the examination of the witness, saying: "Now, I will return,

with the court's permission, to the question I asked originally. Do you know, Mr. Wells, what the speech of people is concerning Isaac B. Remsen in the community in which he lives?" At this point the court again interrupted, saying: "I will not let you go any further than he has gone already. He says he does not know his general reputation in the community. The speech of people may mean the speech of saloon keepers,—one saloon keeper or another on the next block, and there the speech of people means the speech of a whole body of people. It does not mean the speech of two or three people, and that question only misleads the witness. He has said he does not know what his general reputation is in that community, personally." The defendants had a right to show, if they could, the general reputation of the plaintiff in the community where he lived, and they had a right to have the witness answer this question on the part of their counsel. It is by no means clear, from a reading of the questions of the court and the answers of the witness, that the witness intended to say that he did not know the general reputation of the plaintiff in his home community. The court had asked him if he knew what it was to say that a man's reputation was bad in the community in which he lived; had asked him if he knew what it was to say that a man's reputation was good in the community,—questions which were addressed to the personal knowledge of the witness, and which he had answered in the affirmative; and these questions were followed immediately by the question if the witness knew Remsen's reputation in the community,—"whether it is good or bad in the neighborhood in which he lives"? To this question the witness replied that personally he did not, but from the form of the question and its antecedents it is quite as likely that the witness supposed he was answering in respect to his personal knowledge of whether Mr. Remsen was a good or a bad man as that he was answering the exact question propounded by the court; and we are of opinion that counsel was justified in announcing that, "I shall be quite content with the insertion in the minutes of the question last put, with the ruling of your honor upon the subject, and I except," and that this exception presents reversible error. The witness should have been permitted to answer the question, and the plaintiff would have been privileged on cross-examination to have inquired to what extent the witness was familiar with the real speech of people,— whether he had talked with a saloon keeper, or two saloon keepers, or any other citizens. The remarks of the court, quite as much as the ruling, are open to objection, since they tended to prejudice the case of the defendants, and to carry the impression to the jury that the defense was based upon a disreputable public opinion, rather than the real speech of people. It is important, if justice is to be done, that juries shall gather no prejudices upon the trial of an action, and no end of justice was to be served by the remark of the court in reference to saloon keepers.

Albert S. Wells was called as a witness for the defendants. He had testified: "I don't know exactly what they said of him, but the general run of the talk was that he was a crank and hypocrite;" that "this talk was among Methodists—part of the Methodists—and

the rest of the people generally"; that "I can say it was hated by
some; a majority of the people, yes." On cross-examination the
witness testified that he had not testified to the calling of the plain-
tiff a crank on the former trial, and that "quite a number of differ-
ent people called him a crank, a hypocrite." At this point the
court again interrupted, and asked the witness: "Do you know of
any act which Mr. Remsen ever did that would warrant you or any-
body else in saying that he was insincere? A. I don't recall any
just at present. The Court: Hypocrisy involves insincerity. De-
fendants' Counsel: It is not what this man knows or does not know
personally. I respectfully submit it is the speech of people. The
Court: It is the speech of all people, not the speech of one or two
people. A man's general reputation is not made up by what two
or three people say of him, but what they all say. Defendants' Coun-
sel: Is a man's reputation made or unmade by what one man may
know or not know of him? The Court: There is no question now.
Defendants' Counsel: I object to your honor's question, and move
to strike out the answer." The motion was denied, and defend-
ants excepted. This was on cross-examination, or during the cross-
examination; but as the witness had not been questioned as to his
knowledge of the man, and as his knowledge of general reputation
could not depend upon whether he knew of any specific act on the
part of the plaintiff which would justify calling him a crank or a
hypocrite, the question was improper, and it was error to deny the
motion to strike out the answer. There had been no testimony indi-
cating that the witness was basing his testimony on the speech of
one or two people.

In the charge to the jury the court said:

"I charge you that it is defamatory, and it is actionable unless it is true.
I charge you that there is no pretense that it is true. There is no evidence
here which warrants you in even discussing the question whether the libel is
substantially true;" and "the whole question that you have to determine is
how much, taking the entire matter as it has been developed to you into ac-
count, you are going to give the plaintiff as damages."

After elaborating this proposition, the court said:

"What, under all the circumstances disclosed by the evidence, looking at
these two litigants before you, on one side this man who has been libeled, on
the other side the newspaper that has libeled him, does justice require the
newspaper to pay to the citizen? You have a right to consider not only what
will compensate the plaintiff, but you also have a right to consider whether
the defendant is or is not deserving of punishment. This is a case where, if
you think proper, you may find what is called 'smart money.' "

In this charge the learned court went much further than the evi-
dence warranted. There was a pretense that the matter published
was substantially true, and there was evidence in the case, which,
if believed by the jury, would have justified them, in connection
with their common experience and knowledge, in reaching the con-
clusion that so much of the publications as were in fact libelous
were so substantially true as to materially mitigate the damages,
if not to justify the publication. It is, perhaps, true that some of
the witnesses testified to matters that the court thought improbable,
and the witnesses may not have been entitled to credence; but this

was a matter for the jury, rather than the court. This part of the charge was not modified upon defendants' counsel calling attention to the matter, and it was error, in view of the entire tenor of the charge, and the fact that the defendants had set up the substantial truth of the charges in justification, to thus discredit the good faith of the defense by telling the jury that there was "no pretense that it is true," and that there "is no evidence here which warrants you in even discussing the question whether the libel is substantially true." It was necessary, to a proper verdict upon the question of damages, to consider to what extent the matter which was in fact libelous was true,—whether it was substantially true; and the court closed this door to the jury by declaring that there was no evidence to warrant them in even considering this branch of the question.

The case, as it appears from the records, indicates clearly that the plaintiff is a revivalist of the enthusiastic school; that his methods are of the sensational order; and there are indications in the evidence, if it is to be credited, that the plaintiff conducted himself in a manner calculated to engender criticism in the communities in which he had conducted revival meetings, and that the publications complained of were highly colored narratives of the disorderly conduct of some of the residents of the communities. How far the narratives are true in the particulars in which they are libelous, to what extent the plaintiff has been injured, how much the defendants should be called upon to pay for the publications in so far as they are libelous, are matters which should be dispassionately determined upon a full hearing of the witnesses upon relevant questions, and we are convinced that the ends of justice will be best conserved by reversing the judgment and order appealed from, granting a new trial, with costs to abide the event. All concur, except HIRSCHBERG, J., taking no part.